**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| KRISTIN BENNE, as next of kin and Personal Representative of the Estate of CHRISTOPHER KLIEWER, deceased, | § | |
| Plaintiff, | § | |
| v. | § | Case No. CIV-26-1401-D |
| OKLAHOMA COUNTY CRIMINAL JUSTICE AUTHORITY; and | § | |
| BOARD OF COUNTY COMMISSIONERS FOR OKLAHOMA COUNTY, | § | |
| Defendants. | § | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

Plaintiff Kristin Benne, as next of kin and Personal Representative of the Estate of Christopher Kliewer, by and through attorneys of record, Cameron Spradling and Katelyn Elrod of Cameron Spradling, PLLC, and based on information and belief, alleges and states as follows:

## I. THE PARTIES

1. Plaintiff Kristin Benne is the daughter and next of kin of Christopher Kliewer, deceased. Plaintiff is now and was, at all relevant times a resident of Oklahoma City, County of Oklahoma, State of Oklahoma.

2. Defendant Oklahoma County Criminal Justice Authority ("OCCJA" or "Jail Trust") is a public trust created for the furtherance of purported public functions pursuant to 60 Okla. Stat. § 176, *et seq*. OCCJA was created by a certain "Trust Indenture." Under the

Trust Indenture, OCCJA is to "assist" Oklahoma County in its stated objective of operating the Oklahoma "Jail Facilities", which includes the Oklahoma Detention Center ("Oklahoma County Jail" or "Jail"). Under the Trust Indenture, OCCJA was delegated the responsibility of developing policies and procedures to address the administration of the Jail. However, since June 1, 2020, OCCJA has remained the County entity with primary responsibility for the management and operation of the Jail. The Oklahoma County Sheriff is a member of the Oklahoma County Board of County Commissioners as permanent member/trustee of the OCCJA. OCCJA is sued under Plaintiff's municipal liability theory.

3. Defendant Board of County Commissioners for Oklahoma County ("Board", "BOCC" or "Oklahoma County") is the legislative entity with non-delegable statutory responsibility for providing a jail facility for Oklahoma County, Oklahoma that is adequate for the safe keeping of inmates and detainees. *See* 57 O.S. § 41. As a matter of Oklahoma law, BOCC exercises the powers of the county. *See* 19 Okla. Stat. § 3. A suit brought against BOCC is the way Oklahoma law contemplates suing the county. *See* 19 Okla. Stat. § 4. BOCC is charged with ensuring that the Jail has adequate funding and resources to provide constitutionally sufficient conditions of confinement.

## II. JURISDICTION & VENUE

4. The jurisdiction of this Court is invoked pursuant to 28 U.S.C § 1343 to secure protection of and to redress deprivations of rights secured by the Fourteenth Amendment to the United States Constitution as enforced by 42 U.S.C. § 1983, which

provides for the protection of all persons in their civil rights and the redress of deprivation of rights under the color of law.

5. This Court also has original jurisdiction under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

6. The acts complained of herein occurred in Oklahoma County, Oklahoma. Jurisdiction and venue are thus proper under 28 U.S.C. §§ 116(a) and 1391(b).

## III. FACTUAL BACKGROUND

### A. The Death of Christopher Kliewer

7. Christopher Kliewer was booked into the Oklahoma County Jail as a pretrial detainee in the early morning hours of June 8, 2022.

8. The night before he was booked into the Jail, Mr. Kliewer communicated to his ex-girlfriend that he intended to kill himself by mixing pills and alcohol.

9. During Mr. Kliewer's medical intake at the Jail, he reported that he was diagnosed with bipolar disorder and had cancer in his bone marrow.

10. Mr. Kliewer also reported that he took medication for mental illness but could not remember the name of the medication. Mr. Kliewer provided medical staff with the address of the pharmacy at which he filled his prescription.

11. Mr. Kliewer reported that he had been seeing a mental health professional for emotional or mental health problems.

12. Mr. Kliewer also reported that he was hospitalized for depression or

mental health problems in 2016.

13. Later in the day on June 8, 2022, medical staff at the Jail called Mr. Kliewer's pharmacy and confirmed he was on multiple medications for mental health problems.

14. For the duration of his short stay at the Jail, Mr. Kliewer was placed in Pod C on the fourth floor, which is general population.

15. On June 9, 2022, at approximately 5:50 a.m., detention officer Daniel Narty discovered Christopher Kliewer deceased in his cell.

16. Mr. Kliewer had hanged himself from the top bunk of his bed using a bed sheet.

17. The light was on in Mr. Kliewer's cell and Mr. Kliewer's body was clearly visible from the window in his cell door.

18. Both blood pooling and rigor mortis[1] were already observable by medical staff immediately after the discovery of Mr. Kliewer's body.

19. Emergency Medical Services Authority pronounced Mr. Kliewer dead at 6:06 a.m.

20. The Office of the Chief Medical Examiner conducted an exam at 10:45 a.m. and noted that rigor mortis was complete.

---

[1] Rigor mortis is "the physiological process that occurs within hours after death, wherein muscle tissue stiffens." ENCYCLOPEDIA BRITANNICA, *Rigor Mortis*, https://www.britannica.com/science/rigor-mortis (last visited July 13, 2026). "Rigor mortis is initially apparent in small muscles, such as the muscles of the hands and face, which become noticeably stiff within three to four hours after death. . .. Larger muscles are affected later, usually around 12 hours, leading to stiffening of the entire body." *Id.*

21. The Office of the Chief Medical Examiner determined Mr. Kliewer's cause of death to be asphyxia ligature hanging and his manner of death to be suicide.

22. The last recorded sight check, or visual observation, of inmates on Pod C of the fourth floor had occurred approximately ten hours before the discovery of Mr. Kliewer's body.

23. Under Oklahoma Administrative Code § 310:670-5-2 and Jail policy, sight checks were to occur every hour.

24. Daniel Narty was the only "rover"—the detention officer assigned to do sight checks—on the fourth floor during the overnight shift that night.

25. The fourth floor consisted of four pods and housed approximately 300 inmates.

26. Under the direction of his supervisor, Mr. Narty spent the majority of his shift tracking down missing inmates, releasing inmates, or taking new inmates to their cells.

27. No other detention officer offered to assist Officer Narty in completing sight checks as he repeatedly failed to complete them.

28. It was routine for detention officers to miss hourly sight checks without requesting or receiving assistance.

29. Jail staff were on notice that Mr. Kliewer struggled with mental illness, including bipolar disorder.

30. The state of Mr. Kliewer's body when discovered indicates that he had

been deceased for several hours.

31. The failure of Jail staff to adequately monitor Mr. Kliewer caused him actual and severe physical injuries, physical pain and suffering, emotional and mental distress, and death.

32. The failure of Jail staff to adequately monitor Mr. Kliewer constitutes a failure to provide adequate conditions of confinement.

**B. County Policies and Customs**

33. There is an affirmative link between the aforementioned unconstitutional acts and/or omissions of Jail staff and policies, practices and/or customs which Oklahoma County/OCCJA promulgated, created, implemented and/or possessed responsibility for.

34. To the extent that no single officer violated Christopher Kliewer's constitutional rights, Oklahoma County/OCCJA are still liable under a theory of a systemic failure of Oklahoma County/OCCJA policies and procedures as described below. There were such gross deficiencies in staffing, facilities and procedures that Christopher Kliewer was effectively denied constitutional conditions of confinement and adequate medical care.

35. The Jail has long-standing, dangerous, and unabated systemic deficiencies.

36. From its inception in 1991, the Jail has been systemically deficient. Overcrowding, understaffing and inadequate security and supervision have been constant.

37. Following a lengthy investigation, in 2008, the U.S. Department of Justice issued a report on conditions of confinement at the Jail. The DOJ found woefully

inadequate supervision and staffing at the Jail, a lack of basic medical and mental health care, overcrowding and a high rate of inmate assaults and deaths.

38. Since 2008, the Department of Justice has been identifying deficiencies at the OCDC including: a. overcrowding; b. physical layout of the facility prohibiting adequate sight and sound supervision; c. an inordinately high risk of violence due to inability to properly supervise; and d. inadequate staffing numbers.

39. In 2013, the Tenth Circuit Court of Appeals held that Oklahoma County was not entitled to summary judgment in a Jail suicide case involving an inmate named "Holdstock." *See Layton v. Bd. of Cnty. Comm'rs of Oklahoma Cnty.*, 512 F. App'x 861, 872 (10th Cir. 2013). In so holding, the *Layton* Court relied on the DOJ Report and reports from Oklahoma State Department of Health ("OSDH"), as follows:

> The DOJ Report—the product of four separate inspections of the jail—concluded that "certain conditions at the Jail violate the constitutional rights of detainees confined there." Aplt. App., Vol. I, at 155 (DOJ Investigation of the Okla. Cnty. Jail, dated July 31, 2008). The report stated that four years had passed between the DOJ's first three tours of the jail and its most recent one, but "[d]espite this opportunity to improve conditions at the Jail, ... [the DOJ] did not observe improved conditions." *Id.* at 154.
>
> More specifically, the DOJ report stated that "actual direct supervision of detainees at the Jail is virtually non-existent [and the] facility is not adequately staffed to maintain necessary supervision of detainees to secure their safety." *Id.* at 157. It further found that: (1) conditions at the jail make it "difficult, if not impossible, for detention staff to be able to provide adequate safety and security checks of the detainees," *Id.* at 158; (2) the crowded conditions "tax numerous areas of Jail operations and create circumstances that contribute to unconstitutional conditions," *Id.* at 157 n. 4; (3) "detention officers have little time to actually monitor detainees [and] detainees are often left unsupervised for extended periods of time," *Id.* at 158; (4) while surveillance cameras have been installed in many areas of the jail, "blind spots exist within the housing units, such as in ... the inside of the cells, which cannot be monitored with cameras," *Id.*; and (5)

> "[c]ompounding the lack of adequate detainee supervision within the housing units is limited visibility into the individual cells," *Id.*
>
> During the DOJ's tours of the jail, they "uncovered instances where detainees were not provided access to medical care, specifically acute services—with dire results." *Id.* at 166. While the jail has a "sick call system for detainees to access routine medical care services, detainees' serious medical needs are not adequately met." *Id.* (emphasis added). Again, noting problems with nonroutine care, the report included the finding that the jail "has had some problems providing appropriate access to medical care during emergencies." *Id.* at 167. The report described an incident where the medical care that the jail furnished to a detainee was, in the DOJ's opinion, "'unconscionable' during the hours she was in critical need of access to medical care." *Id.*
>
> The report outlined several recommended remedial measures, which, in the DOJ's view, should "at a minimum" be implemented "to address the constitutional deficiencies identified ... and protect the constitutional rights of detainees." *Id.* at 173. Among these, the DOJ recommended that the jail "implement policies and procedures to allow adequate supervision of detainees. This should include [ ] conducting adequate staff rounds ... and promptly responding to medical or other emergencies." *Id.* Within a general admonishment to "ensure the timely assessment, identification and treatment of detainees' medical ... needs," the report outlined a need to "[p]rovide timely and appropriate treatment for detainees with serious medical ... conditions," and provided that "detainees with chronic diseases [should] receive screening, testing, treatment, and continuity of care," and that the jail should "[p]rovide medications ... in a timely manner." *Id.* at 174. Further, according to the DOJ, the jail should "[p]rovide medical and mental health staffing sufficient to meet detainees' serious medical and mental health needs ... includ[ing] staffing to provide timely ... medical care." *Id.* at 175.

*Layton v. Bd. of Cnty. Comm'rs of Oklahoma Cnty.*, 512 F. App'x 861, 864–65 (10th Cir. 2013).

40. The systemic deficiencies identified by the *Layton* Court, such as understaffing and inadequate supervision of inmates, persisted through June 2022.

41. From at least 2008 to present, BOCC has failed to provide sufficient oversight and funding of Jail. Due to the documented dangers at the Jail, including DOJ's

finding of inadequate supervision and staffing and a high rate of inmate assaults and deaths, in 2009, BOCC entered into a Memorandum of Understanding with the federal government. Under this Memorandum of Understanding, Oklahoma County was to adequately fund and staff the jail by 2014, or face court action from the federal government to force compliance.

42. As of June 2022, Oklahoma County had plainly not complied with the requirements of Memorandum of Understanding with the Department of Justice.

43. From at least 2008 to present, chronic shortage of detention officers and the facility's flawed design have made it impossible to adequately supervise the Jail.

44. Documented insufficient staffing levels and the poor condition of the 30+-year-old jail building have contributed to high death rates and a lack of basic rights for inmates at the Jail over the past decade.

45. In May 2021, the National Institute of Corrections provided a report to the BOCC and Jail Trust finding: a. an incomplete staffing plan; b. that new hires receive limited training; c. "[c]lear and convincing present level of staffing was insufficient for a safe and secure jail"; d. it was "[i]mpossible to effectively manage inmate population when they are so short-staffed;" e. that officers were coming to work without proper training; and f. a lack of policies and procedures posted.

46. In 2021, the Jail Trust retained consultant David Parker to provide recommendations to remedy the continuing deficiencies at the Jail. Parker issued a report finding outdated training and policies and procedures, a staff consensus is that "every issue

that transpires in the jail can be traced to staff shortages", and staff being trained to detect and/or intervene in inmate incidents appropriately.

47. In September 2021, the Oklahoma County District Attorney petitioned the Oklahoma County District Court to convene an Oklahoma County Grand Jury to investigate, among other items, the operation of the Jail.

48. Defendant OCCJA was aware of the allegations of the Petition and cooperated with the subsequent investigation by the multicounty grand jury ("MCGJ").

49. Among the issues highlighted by the petition was a lack of physical security for both inmates and staff, and preventable loss of life within the Jail since the OCCJA assumed management thereof. *See* Final Report Regarding [OCCJA] and the Administration of the Oklahoma County Detention Center, Filed in Oklahoma County Case GJ-2021-3 on Mar. 23, 2023.

50. The MCGJ reviewed inspections of the Jail performed by the Oklahoma State Department of Health and the National Institute of Corrections which identified material deficiencies – including severe understaffing – that were an ongoing issue at the jail for years prior to Mr. Kliewer's death. *Id.*

51. The MCGJ further received evidence that inmates "routinely" break holes in the walls of the Jail and "can literally break down walls and tunnel in-between cells." *Id.*

52. The MCGJ received evidence that 73 inmates died, or became ill and died, in the Jail from the period 2000-2019, but since the OCCJA has been in place, 37 inmates have died or became ill and died in the time period July 1, 2020-March 23, 2023. *Id.*

53. Each death in the Jail is a separate, potential homicide case within the jurisdiction of the Oklahoma County District Attorney. The MCGJ received evidence that some of those cases were submitted to the District Attorney for criminal charges, while others were not. *Id.*

54. According to the evidence as reported by the MCGJ, "three (3) major issues have led to deaths in the Jail – inadequate controlled dangerous substance interdiction, inadequate health screening during the intake process, and the failure of detention officers to conduct proper site checks on inmates." *Id.*

55. According to the evidence as reported by the MCGJ, "site checks, required under jail regulations, have not been adequate and falsified site checks have led to deaths in the jail." *Id.*

56. The MCGJ report notes that adequate site checks would both improve inmate safety and security and would improve suicide prevention, as multiple inmates have allegedly died by hanging in the Jail since 2021. *Id.*

57. The MCGJ Final Report concludes: "The MCGJ believes that inadequate staffing, funding, surveillance, and training, coupled with poor law enforcement protocols, led to the significant loss of life within the jail." *Id.*

58. In January 2019, pretrial detainee Krysten Mischelle Gonzalez died by suicide at the Jail after hanging herself from the top bunk of her bed with a sheet.

59. The Estate of Ms. Gonzalez filed a civil rights lawsuit in this Court, alleging that Sheriff Tommie Johnson, acting in his official capacity, deprived Ms. Gonzalez of her

constitutional rights under the Eighth and Fourteenth Amendments. *Pasqualetti v. Johnson*, No. CIV-21-0011-F, 2024 WL 4716011, at *1 (W.D. Okla. Nov. 7, 2024).

60. The Court denied Sheriff Johnson's motion to dismiss, determining the plaintiff adequately alleged that the Jail's systemic failures regarding staffing, sight checks, and facilities (such as bunk beds being bolted to the wall in a manner creating a suicide risk) effectively denied Ms. Gonzalez adequate medical care. *Id.* at *22.

61. In February 2022, pretrial detainee Andrew Avelar was found deceased in his cell at the Jail. Mr. Avelar's body was hanging from the air vent by a sheet.

62. Mr. Avelar's Estate filed a civil rights lawsuit in this Court, alleging that Mr. Avelar either died by homicide or suicide, and that the OCCJA violated Mr. Avelar's Fourteenth Amendment Rights. *Avelar v. Oklahoma Cnty. Crim. Just. Authortiy*, No. CIV-24-909-D, 2025 WL 719789, at *1 (W.D. Okla. Feb. 14, 2025*), report and recommendation adopted sub nom. Avelar v. Oklahoma Cnty. Crim. Just. Auth.*, No. CIV-24-909-D, 2025 WL 715373 (W.D. Okla. Mar. 5, 2025).

63. Relying on the 2008 DOJ Report, the *Layton* opinion, the 2021 National Institute of Corrections Report, and the Multi-County Grand Jury Report, the Court denied the OCCJA's motion to dismiss, determining the plaintiff plausibly alleged that the Jail's systemic failures, including understaffing and inadequately monitoring inmates, was the moving force behind the death of Mr. Avelar, and that the OCCJA was deliberately indifferent to the risks its deficiencies presented. *Id.* at *5-7.

64. Defendants have had abundant opportunity to increase funding, supervision, and training which would allow them to properly staff and address the systemic

deficiencies that have plagued the Jail for decades. Defendants' failure to do so has resulted in death and injury to multiple detainees, including Mr. Kliewer. This failure constitutes deliberate indifference at a municipal level.

## IV. CAUSES OF ACTION

### VIOLATION OF THE EIGHTH AND/OR FOURTEETH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES (42 U.S.C. §1983)

#### A. Conditions of Confinement/Failure to Protect

65. At the time of the complained events, Christopher Kliewer had a clearly established constitutional right under the adequate conditions of confinement, including reasonable safety from serious bodily harm and adequate medical care.

66. Any reasonable Jail employee knew or should have known those rights at the time of the complained of conduct as they were clearly established.

67. Officers failed to protect Christopher Kliewer from harm and failed to provide him adequate medical care, disregarding the known, obvious and excessive risks of harm to Christopher Kliewer. This is deliberate indifference.

68. As a direct proximate result of these Officers' unlawful conduct, Christopher Kliewer suffered actual and severe physical injuries, physical pain and suffering, emotional and mental distress, and death.

#### B. Municipal Liability

69. The aforementioned acts or omissions are causally connected with customs, practices, and/or policies which Oklahoma County/OCCJA/BOCC promulgated, created,

implemented and/or possessed responsibility for.

70. To the extent that no single officer violated Christopher Kliewer's constitutional rights, Oklahoma County/OCCJA are still liable under a theory of a systemic failure of Oklahoma County/OCCJA policies and procedures as described below. There were such gross deficiencies in staffing, supervision, facilities, and procedures that Christopher Kliewer was effectively denied constitutional conditions of confinement.

71. Oklahoma County/OCCJA/BOCC knew, must have known or should have known that, by maintaining such customs, practices, and/or policies, detainees like Christopher Kliewer were at substantial risk of harm. Nevertheless, Oklahoma County/OCCJA/BOCC failed to take reasonable measure to alleviate the harm.

72. Oklahoma County/OCCJA/BOCC, through its failure to take reasonable remediable measures has been deliberately indifferent to citizens', including Christopher Kliewer's, health and safety.

73. As a direct and proximate result of the aforementioned customs, policies, and/or practices, Christopher Kliewer suffered death.

## V. PRAYER FOR RELIEF

**WHEREFORE,** based on the foregoing, Plaintiff prays this Court grant the relief sought, including but not limited to actual and compensatory in excess of Seventy- Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as

is deemed just and equitable.

## VI. JURY DEMAND

Plaintiff demands a trial by jury of all issues.

Dated: July 13, 2026

Respectfully submitted,

*/s/ Cameron Spradling*
Cameron Spradling, OBA No. 8509
Katelyn Elrod, OBA No. 35596
**CAMERON SPRADLING, PLLC**
500 North Walker Avenue, Suite 100
Oklahoma City, Oklahoma 73102
Telephone: (405) 605-0610
Facsimile: (405) 605-0615
*cameron@cameronspradling.com*
*katelyn@cameronspradling.com*

***Attorneys for Plaintiff***

## CERTIFICATE OF SERVICE

I hereby certify that on July 13, 2026, a true and correct copy of the foregoing was filed via CM/ECF, which sent notice of electronic filing to all counsel of record.

*/s/ Cameron Spradling*
Cameron Spradling